IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

TIFFANY LYNN SEARS JUSTICE,

       Plaintiff,

v.                            CASE NO. 2:10-cv-00117

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying the plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge.[1]

The plaintiff, Tiffany Lynn Sears Justice (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on January 19, 2005, November 13, 2007, and December 3, 2007, alleging disability as of November 10, 2003 and January 25, 2007, due to depression, bipolar disorder, schizophrenic, suicidal [thoughts],

_____

[1] The court reminds the parties that pursuant to Local Rule of Civil Procedure 9.4(a), the parties need not file motions in support of judgment on the pleadings. Instead, Plaintiff should file "a brief in support of the complaint," while Defendant files "a brief in support of the defendant's decision." Local Rules of the United States District Court for the Southern District of West Virginia, Local Rule of Civil Procedure 9.4(a).

neck [pain], back [pain], panic disorder with agoraphobia, panic attacks, mood swings, irritability, lung nodules, anxiety, memory loss, sleep disorder, and heart palpitations. (Tr. at 18-19, 46-49, 50-54, 57-62, 98-103, 129-133, 355-58, 365-67, 423-25, 431-38, 714-17.)   The claims were denied initially and upon reconsideration. (Tr. at 18, 360-64, 369-73, 375-78, 417-21.)   On January 19, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 18.)  Hearings were held on August 31, 2006 and September 3, 2008 before the Honorable Steven A. De Monbreum.[2]  (Tr. at 31, 39, 718-54, 755-72.)   By decision dated October 9, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-30.)  The ALJ's decision became the final decision of the Commissioner on December 5, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 8-12.)  On February 3, 2010, Claimant brought the present

---

[2] By hearing decision dated January 25, 2007, ALJ De Monbreum found Claimant not disabled. (Tr. at 381-95)  Subsequently, Claimant requested review by the Appeals Council.  Review was granted by the Appeals Council by order dated May 29, 2008, noting that the portion of the tape of the hearing on August 31, 2006 pertaining to the testimony by the vocational expert was inaudible, directed the ALJ to obtain supplemental testimony from a vocational expert. (Tr. at 396-99.)  Additionally, finding that the ALJ had misquoted in the decision the testimony of the vocational expert concerning Claimant's past relevant work, the Appeals Council directed the ALJ to adhere to the regulatory provisions concerning past relevant work.  Noting that Claimant's subsequent applications filed on November 13, 2007 had been rendered duplicate by its action, the Appeals Council directed the ALJ to associate the claim files and issue a new decision on the associated claims.  Therefore, the subject ALJ decision addresses Claimant's applications for DIB and SSI payments filed on January 19, 2005 and November 13, 2007. (Tr. at 18-19; Pl.'s Br. at 1-2; Def.'s Br. at 2-3.)

2

action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth

3

inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 21.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of bipolar disorder, anxiety disorder with self-reported panic attacks, alcohol dependence, cannabis abuse, and drug abuse in self-reported remission. (Tr. at 21.) At the third inquiry, the ALJ concluded that Claimant's impairments do

4

not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 21-22.)   The ALJ then found that Claimant has a residual functional capacity for all exertional levels, reduced by nonexertional limitations.  (Tr. at 22-29.)  As a result, Claimant can return to her past relevant work.  (Tr. at 29.)  On this basis, benefits were denied.  (Tr. at 30.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 28 years old at the time of the first administrative hearing on August 31, 2006 and 30 years old at the time of the supplemental administrative hearing on September 3, 2008. (Tr. at 723.) She is a high school graduate with one year of college education. (Tr. at 171, 178, 723.)  In the past, she worked as an exotic dancer, cocktail waitress, full service restaurant waitress/cashier, fast food restaurant worker/cashier, department store stocker/cashier, and telemarketer. (Tr. at 724-26, 760-65.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Evidence</u>

On May 17, 1999, Claimant had a physical therapy evaluation at Fayetteville Physical Therapy and Sports Rehabilitation. (Tr. at 683.)  Lisa R. Muckleroy, PT [Physical Therapist], stated:

> She is a 21 y/o w/f [year old white female] who works at Walmart and is on her feet a lot. She is currently working at this time. She is referred with thoracolumbar strain. She started having increased pain last week of idiopathic onset. She states that she fractured her neck two years ago in a MVA [motor vehicle accident] and has had upper back and lower back pain since then.

<u>Id</u>.

6

Notes from Fayetteville Physical Therapy and Sports Rehabilitation indicate that on May 20, 1999, Claimant "cancelled secondary to feeling better" and on June 17, 1999, Claimant "did not f/u [follow up] with PT [physical therapy]." (Tr. at 681.)

On May 19, 2000, Claimant went to Fayetteville Physical Therapy and Sports Rehabilitation as a "self referral for thoracic and low back pain. She has been working as a waitress. The pain had idiopathic onset 3 weeks ago. She is noticing some weakness in her right arm and feels crooked." (Tr. at 680.) Notes dated December 28, 2000 are illegible. (Tr. at 682.)

Medical records indicate Claimant presented to St. Francis Women's & Family Hospital (Greenville, South Carolina) Emergency Department on August 8, 2000 for neck and right shoulder pain. (Tr. at 669-78.) Jon D. Horn, M.D. reviewed an x-ray of Claimant's cervical spine and found "[n]o evidence of cervical spine abnormality." (Tr. at 669.) David G. Olson, M.D. reported:

> The patient presents in a somewhat histrionic fashion with rigidity and refusal to move neck or right shoulder initially. No recent trauma...Impression: 1. Neck pain, probably functional etiology. Plan: Nubain 10 mg and Inapsine 2.5 mg IM in the emergency department. She improved and was provided with a prescription for 5 mg Lortab #8, Skelaxin 400 mg 2 t.i.d. Warm moist compresses. Follow up with Dr. Ware.

(Tr. at 670-71.)

Medical records indicate Claimant received treatment at Greenville Memorial Hospital on January 26, 2001 due to injuries received in a motor vehicle accident. (Tr. at 620-25, 653-60.)

7

Although most of the handwritten notes are illegible, what is
legible indicates Claimant was discharged on the same day with
instructions to "1. Rest; 2. Ice; 3.  Elevate left knee; 4.
Motrin; 5.  Lortab (#10)."  (Tr. at 653.)

On February 9, 2001, Claimant went to Fayetteville Physical
Therapy and Sports Rehabilitation as a "self referral after being
involved in a MVA 2 weeks ago."  (Tr. at 679.)  Lisa R. Muckleroy,
PT, stated: "PT goals are to restore and maintain spinal alignment,
reduce soft tissue restrictions, educate regarding self management
strategies.  Would like to return this lady to improved functional
status with the one visit that we have."  Id.

Medical records indicate Claimant received treatment at
Greenville Memorial Hospital on February 18, 2001 due to injuries
in a motor vehicle accident.  (Tr. at 625-52.)  Although most of
the handwritten notes are illegible, what is legible indicates
Claimant was discharged on the same day: "WF [white female] single
car MVC [motor vehicle collision] rollover ejection ambulatory at
scene with hx [history] of prior C2 fx [fracture] with
immobilization.  CHI [closed head injury] mild with amnesia of
event. Admit CDU [Care Delivery Unit].  Neuro  (Check mark). Clear
C [cervical] spine/T [thoracic]/L [lumbar] spine."  (Tr. at 651.)

On May 31, 2001, Kurt Lee Gandenberger, M.D. wrote a report
stating that Claimant

    presented to my office today alleging disability due to
    the following problems:

8

1) She had a serious <u>motor vehicle accident</u> in 1997...her neck was fractured...

2) Ms. Sears complains of <u>severe depression</u>...She denies hallucinations and delusions.  She is a little <u>anxious</u> but has episodes where she gets short of breath and has palpitations...

Past history: Ms. Sears has had two car wrecks since her initial motor vehicle accident and in each one she was injured further...

Mental    Status...Ms.    Sears    appears    genuinely   and profoundly depressed by the turn her life has taken.  She is slow and has a downcast appearance.  She also seems anxious with sweaty palms and nervous tics.  She is certainly not bizarre, manic, labile, confused, agitated or disturbed.  She has seen an angel before and I reassured her that is fairly normal.  She can spell backwards  and  forwards  and  easily  subtracts  serial sevens.

Neuro...the tone is normal.  Power seems good all around and the reflexes are only mildly decreased in the lower as opposed to the upper extremities...She walks with a marked limp...

Impressions:
1) Severe depression, moderate anxiety and possible post-traumatic    stress    disorder    secondary    to    multiple trauma...untreated.
2)  Moderately  severe  back  and  neck  pain  secondary  to multiple trauma.
3)  Probable post-concussive headaches.  Untreated.

(Tr. at 661-64.)

On July 26, 2001, a State agency medical source completed a Physical Residual Functional Capacity Assessment and concluded that Claimant could perform light work with the exertional ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and to have unlimited push

and/or pull abilities. (Tr. at 517.) Claimant was found to be capable of occasionally performing all postural activities with the exception of kneeling and crouching, which she could be frequently. (Tr. at 518.) Claimant was determined to have no manipulative, visual, or communicative limitations. (Tr. at 519-20.) She was found to have no environmental limitations save to avoid concentrated exposure to hazards. (Tr. at 520.) The evaluator, William O. Crosby, III, M.D. noted Claimant's primary diagnosis to be "MSK [Musculoskeletal]" and the secondary diagnosis to be "H/As [headaches]." (Tr. at 516, 619.)

On August 27, 2001, Michael Dosher, PT [physical therapist], stated in an initial evaluation report that Claimant, a "self referral," had neck and back pain:

> She reports a lengthy history including a C2 fracture in 1997, several MVA's [moving vehicle accidents]. She has seen physical therapists in West Virginia, which helped considerably...
>
> Initial Treatment: Consisted of soft tissue mobilization and myofascial release to the lumbar and thoracic regions. Followed by instruction in initial and thoracic stretching exercises...
>
> Assessment: Myofascial lumbar thoracic and cervical tightness with postural and positional faults...
>
> Plan: Continue PT for 1 to 2 additional treatments with soft tissue mobilization myofascial release and development of home program.

(Tr. at 618.)

On February 12, 2002, Claimant was evaluated by Marcia A. Oliver, M.D. for the South Carolina Vocational Rehabilitation,

10

Department of Disability Determination Division.  (Tr. at 615-16.)

Dr. Oliver noted:

> Patient states she had a bad bout of depression after the 1997 accident.  In 1998 she "didn't want to live."  She was using alcohol heavily and took an overdose of pills as a suicide attempt/gesture.  She was in a psychiatric hospital for a week, released on medications, which she elected to stop taking...She denies [current] use of drugs, alcohol, or tobacco...
>
> A/P [Assessment and Plan]:
> 1.  Status post neck injury.  While of course with the onset of post traumatic arthritis she will never be returned to pre-injury condition, her main complaint is not any loss of neurological function, but more discomfort and stiffness...
> 2.  Hypermobile joint syndrome.  The patient does not have any evidence of arthritis...She is advised that weight bearing activity and muscle strengthening is going to be the treatment for her body aches and her lower back pain.  They will also help her neck.
> 3.  Adjustment disorder.  I am not seeing any evidence of active major depression or other mental illness at this point.  She is however somewhat perseverating [sic] on her symptoms, and support group or formal counseling would be very helpful in her mental hygiene.
> 4.  Mild refractive visual error.  It should be amenable to correction with lenses.
>
> In short, Ms. Sears function is currently impaired by several factors which could be significantly improved by comprehensive treatment.  It can be anticipated, however that she will continue to have discomfort in her neck, but she is bright and motivated and would be a good candidate for vocational rehabilitation in a field which would not put excessive stress on her neck.

Id.

On March 12, 2002, a physician with an illegible signature stated that he had reviewed the medical evidence and the residual functional capacity evaluation of Dr. Crosby and "affirmed as written."  (Tr. at 523.)

On April 2, 2004, Gary Craft, M.D. provided a Disability Determination Evaluation of Claimant for the West Virginia Disability Determination Service.   (Tr. at 171-75, 665-68.) He reported that he physically examined Claimant on March 29, 2004:

> In summary, this is a 25-year-old female who sustained a fracture to the cervical spine at age 19.  She was complaining with recurring pain over the neck, into her back, pelvic area and both legs.  She had a minimum loss of motion of the cervical neck.  She had excellent grip strength and fine manipulation.  She had a normal gait and station.  I could not detect any neurological deficit involving the four extremities.
>
> She gave a long history of mental condition manifested by schizophrenia, bipolar and anxiety and depression and she had attempted suicide on several occasions.  She was not on any medication for her nervous condition at the present time due to the fact that she is 15 weeks pregnant.  During the examination, she was very cheerful, very well oriented and related well to other people.  I could not detect any deterioration in her personal habits or any constriction of interests or any restriction of activities related to her nervous condition.
>
> She was well nourished and free of any nutritional deficiency.
>
> I could not detect any cardiopulmonary disease or any peripheral vascular disease.
>
> The long term prognosis for the nervous condition is fair with treatment.
>
> The long term prognosis for the musculoskeletal system is good.

(Tr. at 172-73.)

On May 17, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and concluded that Claimant had a non-severe physical impairment.  (Tr. at 183-90.)

The evaluator, Joe Rehr, noted Claimant's primary diagnosis as "h/o [history of] neck pain (S/P [status post] cervical FX [fracture])." (Tr. at 183.)   He also noted: "back/neck/depression/bi-polar/ schizophrenic/suicidal." Id.   He marked no boxes on the form to indicate exertional, postural, manipulative, visual, communicative or environmental limitations.   (Tr. at 184-87.)   On the form, he handwrote the following:

> The claimant has a h/o [history of] cervical spine fx [fracture] at age 19.   Currently she has minimal LOM [limitation of motion] and her neuro [neurological] exam is intact.   She is able to perform a variety of activities around the home, including laundry, mopping floors, washing dishes.   Her ADL's [activities of daily living] appear limited 2° [secondary] P [psychological] problems.   Her physical impairment is minimal - denial. NON-SEVERE.

(Tr. at 188.)

On March 31, 2005, Vishnu A. Patel, M.D. reported a consultation with Claimant regarding a chest CT

> [d]one 2/14/05 which revealed two small pulmonary parenchymal nodules about 3 mms in diameter in the superior segment of the right lower lobe.   Appears to be benign in nature.   No axillary lymphadenopathy...It will be very hard to do a biopsy on these nodules.   Malignancy is very low.   I would like to follow her up with periodical CAT Scans to establish stability in the size of the nodules...Pt's [patient's] respiratory symptoms are consistent with underlying hyper reactive airway disorder.   Pt [patient] may have underlying asthma.

(Tr. at 220.)

On September 22, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and concluded that Claimant had a non-severe physical impairment.   (Tr. at 226-

13

33.)  The evaluator, Uma P. Reddy, M.D. noted Claimant's primary diagnosis to be "nodules on lungs." (Tr. at 226.)  She marked no boxes on the form to indicate exertional, postural, manipulative, visual, communicative or environmental limitations. (Tr. at 227-30.)  She also noted: "Well built 27 years old female with allegation of some lung problems, medically not significant enough to cause any limitations. ADLs [activities of daily living] are okay, PFT [pulmonary function test] are good. None severe physical." (Tr. at 231.)

On August 7, 2006, Claimant had a CT of the chest with IV contrast. Afzal U. Ahmed, M.D. stated in a radiology report:

IMPRESSION:

Question of a small focus of infiltrate/atelectasis in the right mid chest not seen before. Slightly prominent axillary lymph nodes bilaterally, residual thymus identified in the anterior mediastinum. Vague nodule like densities described previously in the right and left chest is unchanged and has benign appearance. No other new nodules identified.

(Tr. at 337, 564.)

Records indicate Claimant was treated by Walid Azzo, M.D., Ph. D. on January 3, 2007, January 12, 2007, and April 3, 2007. (Tr. at 452-54.)  Additional notes indicate Claimant was a "no show" on February 14, 2007 and attempted but was refused an appointment on November 13, 2007 due to "she is released from our services." (Tr. at 452-53.)  The initial visit indicates that Claimant was "6 days s/p [status post] right knee ACL reconstruction...c/o [complains

14

of] fell backward down steps was in ER yesterday...Pt [patient] is
exaggerating the pain.   Went to ER to get pain meds."   (Tr. at
454.)   The notes dated January 12, 2007 state: "Pt [patient] is
here   complaining...about   the   pain   meds...right   knee   much
improved...Pt still took all pain meds."   Id.   The April 3, 2007
notes state: "Pt was telling every one how poor I treated her (not
a ground for this).   Used brace for only 2 weeks.   Walking
well...Did not finish PT [physical therapy]."   (Tr. at 453.)

Psychiatric Evidence

On April 23, 2001, Teresa A. Marchi, Disability Examiner,
South Carolina Vocational Rehabilitation Department, wrote a report
titled "Lay Evidence" in reference to Claimant.   (Tr. at 684-85.)
The document states:

> I contacted Tiffany Sears to get more information about
> her problems with depression.  Tiffany was very talkative
> and willing to answer my questions.
>
> Tiffany is 22 years old.  She was in a car accident in
> 1997 that broke her neck.  In 1998, she stated she put
> herself in a psychiatric hospital for 1 week.  She said
> she was diagnosed with manic depression due to the car
> accident.  She reported that she has had two more car
> accidents in 2001.  Currently, she states that she has a
> lot of pain because of the accidents.  I asked her what
> problems she was currently having with the depression.
> She stated that there were days that she did not feel
> like getting out of bed.  She stated she sometimes felt
> like life is awful.  She stated that these feelings are
> not really related to her physical problems.  She is
> currently not on any medication except over the counter
> pain medicine.  She had not had any mental health
> treatment since her 1998 hospitalization...
>
> She stated that she is young and that she use to like to
> go out dancing.  However, her back pain prevents this.

15

> I asked Tiffany what was the main factor that kept her
> from working.  She stated it is the pain in her back and
> legs.  She stated that she has been having symptoms of
> depression since 1998.  However, she stated that she is
> dealing with it on her own.

Id.

On July 10, 2001, Joseph K. Hammond, Ph.D., evaluated Claimant
upon request of Teresa Marchi, Disability Examiner for the South
Carolina Vocational Rehabilitation Department.  (Tr. at 686-89.)
Following the evaluation, Dr. Hammond's concluded:

> Ms. Tiffany Sears participated in a mental status
> examination during which she did appear capable of
> sustained attention and appeared capable of completing
> tasks in a timely manner.  She appears capable of
> managing funds.  She appears to have a major depressive
> episode which is currently moderate and exacerbated by
> grief over a recent loss.  She has an anxiety related
> disorder not otherwise specified with some symptoms of
> post traumatic stress disorder.  She is status post
> multiple orthopedic trauma related to a moving vehicle
> accident.  Finally she may have a mild cognitive disorder
> with mild problems in learning and mental control.  From
> a psychological perspective she appears to have mild
> limitations in activities of daily living with mild to
> moderate limitations in socialization and moderate
> limitations in persistence.  She describes additional
> limitations attributed by her pain.

(Tr. at 688-89.)

On August 1, 2001, a State agency medical source completed a
Psychiatric Review Technique form and Mental Residual Functional
Capacity Assessment of Claimant.  (Tr. at 598-614.)  The evaluator,
J. K. Phillips, III, Ph. D. stated the categories upon which the
medical disposition is based are "12.02 Organic Mental Disorders,
12.04 Affective Disorders, 12.06 Anxiety-Related Disorders, 12.08

16

Personality Disorders." (Tr. at 601.) The evaluator concluded that Claimant had no restriction of activities of daily living and a moderate degree of limitation regarding difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at 611.) Dr. Phillips found that the evidence did not establish the presence of the "C" criteria. (Tr. at 612.)

In the Mental Residual Functional Capacity Assessment of Claimant dated August 1, 2001, Dr. Phillips found Claimant was "Not Significantly Limited" in all areas except two: "The ability to carry out detailed instructions" and "The ability to interact appropriately with the general public," which were found to be "Moderately Limited." (Tr. at 598-600.) Dr. Phillips noted: "The claimant can comprehend, remember and carry out simple instructions beyond two hours. The claimant can relate adequately to supervisors and co-workers in situations that do not require constant interaction with the public. The claimant can adapt effectively to workplace changes." (Tr. at 600.)

On March 12, 2002, H. M. Clark, Ph.D. affirmed Dr. Phillips' assessments of August 2001 "as written." (Tr. at 613.)

On September 26, 2003, Claimant underwent a psychiatric evaluation by Safiullah Syed, M.D. (Tr. at 161-63, 282-84.) Dr. Syed stated that Claimant was being evaluated for her mood problems upon referral by Dr. Rosas, her primary physician. (Tr. at 161,

17

282.)  Dr. Syed made these findings:

> MENTAL STATUS EXAM:
> Patient was alert and oriented when seen.  She makes good
> eye contact.  Her mood is dysthymic.  Affect is anxious.
> She shows some tremors in her hands.  Her thought
> processes appear goal directed and coherent.  She
> reported she used to cut herself several times in the
> past.  She still has scars on her wrists.  Thought
> content showed no delusions.  No suicidal thoughts at
> this time, but has had fleeting suicidal ideations.  She
> has reported auditory and visual hallucinations in the
> past, but not at this present time.  At this time, she
> shows fairly intact memory, insight, and judgment.
>
> DIAGNOSIS:
> AXIS I:   Major Depressive Disorder, Recurrent, Moderate
>           Anxiety Disorder, NOS
>           Panic Attacks
>           History of Polysubstance Dependence
> AXIS II:  No Diagnosis
> AXIS III: History of Motor Vehicle Accident with Neck
>           Injury
> AXIS IV:  Recently Lost Baby, History of Abuse
> AXIS V:   GAF = 55
>
> PLAN:
> Patient is a 25 year old, white female with a history of
> depression, anxiety, and substance abuse problems.  She
> has a history of sexual abuse.  She has some issues that
> she needs to work on with a counselor.  We will schedule
> her for counseling, as well as psychological testing.
> Paxil is being changed to Paxil CR 50 mg. a day.
> Wellbutrin XL is being added as 150 mg. a day.  I have
> given samples of that.  Trazodone is being added as 50 to
> 100 mg. at night to help her sleep.  Patient will be
> reassessed within a month.

(Tr. at 162-63.)

On October 23, 2003, Claimant underwent psychological testing

by Stephanie K. Ford, M.A., licensed psychologist, to provide

information for outpatient treatment planning.  (Tr. at 158-61,

279-81.)  Ms. Ford concluded:

18

> Tiffany L. Sears is currently operating in the Average
> Range of intellectual functioning with an IQ Composite
> Score of 96+/-5 on the K-BIT.  However due to the
> significant 24-point difference between the Vocabulary
> and Matrices Subtest Scores, a more comprehensive test
> battery is recommended to better understand the client's
> discrepancy between her verbal and nonverbal abilities.
> WRAT-3 results were not suggestive of learning
> disabilities in her academic skills.  The obtained test
> results may slightly underestimate her level of general
> intellectual functioning and academic achievement due to
> mildly impaired concentration.  Self-reported symptoms of
> depression and anxiety were in the Severe Range.  The
> client admitted to fleeting suicidal ideation, but denied
> a plan or the intent to harm herself.  Ms. Sears reported
> she had informed Dr. Syed of this ideation.  The client
> was offered hospitalization, but refused at the present
> time... Also, Ms. Sears verbally contracted with the
> undersigned not to harm herself...She denied homicidal
> thoughts.

(Tr. at 160, 281.)

On October 24, 2003, Dr. Syed stated that Claimant was being seen for a follow-up visit and that she stated "she was not doing well, and felt like dying." (Tr. at 170, 285.) She also reported that she would like to "go back to South Carolina in the next few weeks...She was advised to follow up with local community mental health center in South Carolina.  She may come back to us again before leaving for South Carolina." Id. Dr. Syed prescribed Paxil CR and Vistaril.  Id.

On November 7, 2003, Claimant was admitted to Appalachian Regional Healthcare, Inc., Beckley - Appalachian Regional Hospital [ARH], due to depression and self-inflicted lacerations.  (Tr. at 165.) Nadeem Ahmed, M.D. stated that Claimant was admitted through the Emergency Room ["ER"].  (Tr. at 166.) He stated:

19

The patient reports she lost her pregnancy of about three months a few weeks ago, and that caused a relapse of her depression and drug use.  The patient reports that she had been sober throughout her pregnancy, and has not been using any illicit drugs, including crack/cocaine; but, after she lost the pregnancy, she had a relapse with recurrent and heavy use of cocaine...The patient has required several admissions in North Carolina, and also was admitted in 1998, and has been treated for depression and anxiety by Dr. Syed.  Her last visit with him was about a month ago...The patient is separated.  She does not have any children.  She has been working at Cracker Barrel as a waitress.  Her mother is very supportive. The patient has a long history of addiction to different drugs, including Ecstasy, LSD [d-Lysergic Acid Diethylamide], amphetamines, GHB [Gamma-Hydroxybutyric Acid (also known as date rape drug)], ketamine, and cocaine.

(Tr. at 166-67.)

On November 16, 2003, Claimant was discharged from Appalachian Regional Healthcare, Inc., Beckley - ARH.  (Tr. at 164.)  Dr. Syed stated in the discharge summary:

DISCHARGE DIAGNOSES
AXIS I:
1) Major depression, recurrent.
2) Generalized anxiety disorder.
3) Polysubstance dependence.
AXIS II:
No Diagnosis.
AXIS III:
1) Chronic pain.
2) Self-inflicted laceration.
AXIS IV:
Problems with primary support.
AXIS V:
GAF equivalent 55...

HOSPITAL COURSE
The patient was admitted because of depression and self-inflicted lacerations.  She tried to hurt herself by cutting her wrists.  The patient was admitted and provided with a safe and therapeutic environment.  They were superficial lacerations.  She reported depression

20

"some time." She was started on Seroquel by Dr. Ahmed. The patient's Paxil was continued. Later, it was raised to help with the depression. Remeron was added at night to help with mood. During her stay in the hospital, the patient has had mood problems. At time, she was depressed in the evening. She was interested in the substance abuse program. The counselor worked with her and the Mother's Program accepted her. Later, she denied being suicidal or homicidal, or having symptoms of psychosis, and wanted to go home. She was discharged in a stable and improved condition, to be followed up at FMRS, as well as our clinic.

(Tr. at 164-5.)

On December 23, 2003, Dr. Syed signed a form titled "Disability Certificate" for Claimant which stated in full: "This is to certify that Tiffany Sears has been under my professional care - request temporary disability from 11/10/03 to undetermined. Remarks: This patient is currently disabled from any gainful employment." (Tr. at 169.)

On April 1, 2004, Claimant had an "Initial Intake Assessment" at Southern Highlands Community Mental Health Center upon referral by Dr. Huffman, Claimant's obstetrician/gynecologist [OB/GYN]. (Tr. at 275-78.) The assessment, signed by Patty Flanagan, LPC [Licensed Professional Counselor], states in part:

> [s]he is currently 17 weeks pregnant...Tiffany had a miscarriage in August 2003 and was in the hospital briefly. She was also hospitalized for ten days at BAR-H [Beckley Appalachian Regional Hospital] last fall after an attempted suicide...

> Tiffany spent almost six years as a dancer in South Carolina. She started as a cocktail waitress but when she discovered the amount of money that could be made dancing, she changed her job. She reports making huge amounts of money, but becoming incredibly involved in

21

drugs...

Tiffany denied any use of cigarettes or IV drug use.  She acknowledged, however, that for approximately five or six years she was heavily involved in using marijuana, Ecstasy, GHB and methamphetamines.  She reports that she has been basically clean for two years with the exception of methamphetamines.  She acknowledged that she did use that one time during her first pregnancy.  She explained that when she returned home, she became involved with her old friends who convinced her to use.  She had entered and won a competition at Southern Exposure and partied with her friends for two days.  She explained that when she came home from that binge to her parents' home, she felt "ashamed and dirty" and as a result made a decision to quit totally...

When asked to describe her general mood, Tiffany talked about feeling like she was "just there" and hopeless. She also spoke of feeling extremely moody and irritable as though she wanted to pick a fight.  She described her mood as "irrational mood swings."  She spoke about manic periods that occur for several hours several times a week and panic attacks which prevent her from going out in public or even pumping gas.  She denied any current suicidal ideation, mostly because she's so pleased to be having a child.  There was no evidence of homicidal ideation or delusion.  She did talk about some visual hallucinations that started when she was a child...

Tiffany's OB/GYN will continue to prescribe her medication.  She will be referred for individual therapy to address the issues presented.

(Tr. at 275-78.)

On May 5, 2004, Claimant underwent a psychological evaluation by Lisa C. Tate, M.A., licensed psychologist, and Kimberly D. Caudell, M.A., supervised psychologist.  (Tr. at 176-82.)  The evaluators made these findings:

**Mental Status Examination**
**Orientation** - She was alert throughout the evaluation. She was oriented to person, place, time and date.
**Mood** - Observed mood was dysphoric.

22

**Affect** - Affect was mildly restricted.
**Thought Processes** - Thought processes appeared logical and coherent.
**Thought Content** - There was no indication of delusions, obsessive thoughts or compulsive behaviors.
**Perceptual** - She reports a history of visual hallucinations involving seeing a black figure.  She also reports a history of tactile hallucinations involving feeling the black figure coming up in her bed and trying to pull a blanket from her.
**Insight** - Insight was fair.
**Judgment** - Within normal limits based on her responses to the finding the letter question.  She stated "put it in the mail box."
**Suicidal/Homicidal Ideation** - She denies suicidal and homicidal ideation.
**Immediate Memory** - Immediate memory was within normal limits.  She immediately recalled 4 of 4 items.
**Recent Memory** - Recent Memory was within normal limits.  She recalled 4 of 4 items after 30 minutes.
**Remote Memory** - Remote memory was within normal limits based on ability to provide background information.
**Concentration** - Concentration was mildly deficient as she received a scale score of 6 [on] the Digit Span subtest of the WAIS-III.
**Psychomotor Behavior** - Characterized by psychomotor agitation.
**Social Functioning** - Mildly to moderately deficient as she was friendly, appropriate and related fairly well.  She was cooperative, responsive and maintained fair eye contact.  Speech rate was mildly pressured...

**DIAGNOSTIC IMPRESSION**

| | | |
|---|---|---|
| AXIS I: | 296.90 | Mood Disorder NOS [not otherwise specified] |
| | 300.00 | Anxiety Disorder NOS |
| | 305.00 | Alcohol Abuse, Early Full Remission |
| | 304.80 | Polysubstance Dependence, Early Full Remission |
| AXIS II: | 301.9 | Personality Disorder NOS |
| AXIS III: | By self report: | Neck problems, back problems, hip problems and 5 months pregnant... |

**DAILY ACTIVITIES**
**Typical Day**: Ms. Sears reports she goes to bed at 10:30

pm and gets up at 9:30 am.  She states "I get up, I eat breakfast, I do dishes, I make the bed, I dust, I wash clothes, I run the vacuum cleaner, I eat lunch, I watch t.v., I make dinner, maybe I'll go see a friend or rent a movie, I wash dishes and I go to bed."...

**SOCIAL FUNCTIONING**
Ms. Sears was friendly, appropriate and related fairly well.  She was cooperative, responsive and maintained fair eye contact.  Speech rate was mildly pressured. Psychomotor behavior was characterized by psychomotor agitation.  Based on interaction during the evaluation, overall social functioning is mildly to moderately deficient.

**CONCENTRATION**
Overall, attention/concentration were mildly deficient based on her performance on the Digit Span subtest of the WAIS-III.

**PERSISTENCE**
Within normal limits as she was persistent and required little encouragement during the MSE [mental status examination].

**PACE**
Within normal limits based on clinical observation during the evaluation.

**CAPABILITY TO MANAGE BENEFITS**
Ms. Sears appears incapable to [sic] manage any benefits she might receive due to her history of alcohol/substance abuse.

(Tr. at 179-81.)

    On May 17, 2004, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 191-204.)  The evaluator, Rosemary L. Smith, Psy. D., found that Claimant's impairment was not severe.  (Tr. at 191.)  Dr. Smith stated the categories upon which the medical disposition is based are "12.04 Affective Disorders, 12.06 Anxiety-Related Disorders, 12.08

Personality Disorders." <u>Id</u>.   She noted "Substance Addition Disorders...In Remission."   (Tr. at 199.)   She concluded that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence, or pace, and one to two episodes of decompensation during the period of assessment.  (Tr. at 201.)   She found that the evidence did not establish the presence of the "C" criteria.   (Tr. at 202.)   Dr. Smith noted Claimant's allegations were "Depression/Bi-polar/Schizophrenia/ suicidal" and concluded:

> Claimant is not in treatment w/ [with] Dr. Syed at this time.  12/22/03 Dr. Syed noted claimant was "disabled" from any gainful employment.  No significant weight is given to this.  Claimant is not in treatment with him at this time and the evidence does not support sign [significant] limitations. Per "B" criteria, impairments not severe.

(Tr. at 203.)

On March 18, 2005, a State agency medical source completed a Psychiatric Review Technique form.   (Tr. at 205-18.)   The evaluator, Rosemary L. Smith, Psy. D., reevaluated Claimant and again concluded that her impairment was not severe. (Tr. at 205.) Dr. Smith stated the categories upon which the medical disposition is based are "12.04 Affective Disorders, 12.06 Anxiety-Related Disorders." <u>Id</u>.   She concluded that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, concentration,

25

persistence, or pace, and no episodes of decompensation during the period of assessment.  (Tr. at 215.)  She found that the evidence did not establish the presence of the "C" criteria.  (Tr. at 216.) Dr. Smith noted:

> The evidence does not support the "C" criteria for Panic Disorder with Agoraphobia.  The most recent OV [office visit] notes indicate neutral mood and good memory. Claimant is not credible re: problems with concentration and memory.  Her ADL's [activities of daily living] including child care, paying bills, and cooking as well as MSE's [mental status examinations] do not support significant limitations in C/P/P [concentration/ persistence/pace].  She also is not credible re: irritability.  She has been cooperative at OV's and there is no evidence of significant limitations.  Per "B" criteria, Impairments Not Severe.

(Tr. at 217.)

On September 22, 2005, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 234-47.)  The evaluator, Timothy Saar, Ph. D., found that Claimant's impairment was not severe.  (Tr. at 234.)  Dr. Saar stated the categories upon which the medical disposition is based are "12.04 Affective Disorders, 12.06 Anxiety-Related Disorders."  Id.  He concluded that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation during the period from November 10, 2003 to the date of the review.  (Tr. at 244.)  He found that the evidence did not establish the presence of the "C" criteria.  (Tr. at 245.)  Dr. Saar noted:

> Analysis: Clmt's [claimant's] statements re: her F.C.
> [functional capacity] - the severity is not fully
> supported by the evidence. Clmt can meet personal care
> needs, perform basic household task, prepare simple
> meals, and take care of her 9 mo [month] old child. Tx
> [treatment] source not [notes] clmt interacts
> appropriately, with good attention and memory. The
> evidence does not support severe limitation in
> functioning due to a mental impairment.
> Decision - Impairment not severe.

(Tr. at 246.)

On February 17, 2006, Alina Vrinceanu, M.D., Staff Psychiatrist, wrote a letter to the Social Security Administration and included medical records dated April 1, 2004 to February 17, 2006. (Tr. at 248-78.) Although the handwritten notes are largely illegible, the typewritten letter states:

> Ms. Justice has been under my care at Southern Highlands
> Community Mental Health Center since May 2004.
>
> Her diagnoses are: Bipolar Disorder, Not Otherwise
> Specified, and Panic Disorder with Acrophobia.
>
> Ms. Justice experiences symptoms of depression,
> irritability, mood swings, panic attacks, anxiety,
> concentration and memory difficulties that interfere with
> her ability to sustain gainful employment at this time.
>
> The above symptoms may contribute to difficulties
> managing finances and paperwork, as well as difficulties
> meeting deadlines.

(Tr. at 248.)

On June 16, 2006, Dr. Vrinceanu, M.D. completed a form titled "Mental Impairment Questionnaire." (Tr. at 286-91, 525-30.) Although the handwritten portions of the form are largely illegible, Dr. Vrinceanu has checked boxes which identify

27

Claimant's signs and symptoms as: Anhedonia or pervasive loss of interest in almost all activities; Appetite disturbance with weight change; Decreased energy; Feelings of guilt or worthlessness; Generalized persistent anxiety; Mood disturbance; Difficulty thinking or concentrating; Persistent disturbances of mood or affect; Memory impairment - short, intermediate or long term; Sleep disturbance; Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). (Tr. at 287, 526.)

In a section labeled "Mental Abilities and Aptitudes needed to do Unskilled Work," Dr. Vrinceanu has checked that Claimant has "Limited but satisfactory" ability to: "Understand and remember very short and simple instructions; Carry out very short and simple instructions; Maintain regular attendance and be punctual within customary, usually strict tolerances; Ask simple questions or request assistance; Be aware of normal hazards and take appropriate precautions; Adhere to basic standards of neatness and cleanliness; Use public transportation." (Tr. at 287-89, 526-28.)

Dr. Vrinceanu checked that Claimant has "Seriously limited, but not precluded" ability to: "Remember work-like procedures;

28

Maintain attention for two hour segment; Make simple work-related decisions; Accept instructions and respond appropriately to criticism from supervisors; Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Interact appropriately with the general public; Maintain socially appropriate behavior; Travel in unfamiliar place." <u>Id</u>.

She indicated that Claimant is "Unable to meet competitive standards" regarding: "Sustain an ordinary routine without special supervision; Work in coordination with or proximity to others without being unduly distracted; Complete a normal workday and workweek without interruptions from psychologically based symptoms; Perform at a consistent pace without an unreasonable number and length of rest periods; Respond appropriately to changes in a routine work setting; Deal with normal work stress; Understand and remember detailed instructions; Carry out detailed instructions; Set realistic goals or make plans independently of others; Deal with stress of semiskilled and skilled work." <u>Id</u>.

Dr. Vrinceanu further indicated that Claimant did have a low IQ or reduced intellectual functioning. (Tr. at 289, 528.) She found that Claimant had "Moderate" "Restriction of activities of daily living" and "Difficulties in maintaining social functioning"; "Marked" "Deficiencies of concentration, persistence or pace"; and "Three" "Repeated episodes of decompensation within 12 month period, each of at least two weeks duration." (Tr. at 289-90, 528-

29.)

Dr. Vrinceanu concluded that Claimant had an affective disorder of at least two years' duration and "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" and that on the average, she would anticipate that Claimant's impairments or treatment would cause her to be absent from work "more than four days per month." (Tr. at 290-91, 529-30.) She further checked statements that the impairment had lasted at least twelve months, that Claimant was not a malingerer, and that she could manage benefits in her own best interest. (Tr. at 291, 530.)

On August 3, 2006 and August 21, 2006, at the request of her representative, Claimant underwent psychological evaluations by Tony R. Goudy, Ph.D., Licensed Psychologist. (Tr. at 292-97, 586-97.) The evaluator noted that the initial evaluation was cancelled when Claimant "became extremely upset when discussing her history of childhood sexual abuse." (Tr. at 292, 586.) In regard to her drug and alcohol history, he stated: "According to Ms. Justice, she rarely consumes alcoholic beverages and has never had a drinking problem. She admitted that she may smoke marijuana a couple of times a year, but adamantly denied ever having a drug problem." (Tr. at 294, 588.) He diagnosed her with "Bipolar 1 Disorder, Most Recent Episode Depressed, Severe with Psychotic Features...PTSD

30

[Post Traumatic Stress Disorder], chronic" and provided this summary with recommendations:

> Ms. Tiffany Justice is a 28 year-old Caucasian female with a long history of mental illness dating back to childhood sexual abuse. She recalls being suicidal as early as the age of 12. She has a long history of suicide attempts, self mutilation, and psychiatric hospitalizations. She has seen multiple therapists over the years, and her current psychiatrist is prescribing Lamictal, Cymbalta, and Geodon. She has had numerous other medication trials in the past, including Zoloft, Remeron, Trileptal, and Wellbutrin. Testing today supports her veracity regarding psychotic symptomology and indicated severe levels of depression [Current GAF: 45-50].

> Clearly, Ms. Justice should be assessed under multiple listings. The first of which would be 12.04 Affective Disorders. Specifically, under A.3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of either or both manic depressive syndromes.

> Ms. Justice should also be assessed under 12.06 Anxiety Related Disorders. Specifically, under A.5. Recurrent and intrusive recollections of a traumatic experience, which are source of marked distress.

> When taking the above in combination, it is believed that Ms. Justice suffers from the following B criteria functional limitations:

> Activities of Daily Living - mild to moderate impairment.
> Social Functioning - mild to moderate impairment.
> Concentration, Persistence, and Pace - marked impairment.
> Decompensation - repeated episodes.

> Therefore, it is my firm opinion that Ms. Justice meets a listing in combination. It is also my opinion that Ms. Justice is quite mentally ill, and will require years of therapy and psychiatric treatment to become stabilized.

(Tr. at 296-97, 590-91.)

On August 23, 2006, Dr. Goudy also completed a form titled

31

"Mental Impairment Questionnaire." (Tr. at 298-303, 592-97.) Dr. Goudy checked boxes which identify Claimant's signs and symptoms as: Anhedonia or pervasive loss of interest in almost all activities; Appetite disturbance with weight change; Decreased energy; Thoughts of suicide; Feelings of guilt or worthlessness; Impairment of impulse control; Mood disturbance; Difficulty thinking or concentrating; Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; Psychomotor agitation or retardation; Persistent disturbances of mood or affect; Hallucinations or delusions; Hyperactivity; Flight of ideas; Manic syndrome; Pressure of speech; Easy distractibility; Autonomic hyperactivity; Sleep disturbance; Decreased need for sleep; Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). (Tr. at 299, 593.)

In a section labeled "Mental Abilities and Aptitudes needed to do Unskilled Work," Dr. Goudy has checked that Claimant has "Unlimited or Very Good" ability to: "Remember work-like procedures; Make simple work-related decision; Ask simple questions or request assistance; Be aware of normal hazards and take appropriate precautions; Adhere to basic standards of neatness and cleanliness; Travel in unfamiliar place; Use public transportation." "Limited but satisfactory" ability to:

32

"Understand and remember very short and simple instructions; Carry out very short and simple instructions; Perform at a consistent pace without an unreasonable number and length of rest periods; Accept instructions and respond appropriately to criticism from supervisors, Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Respond appropriately to changes in a routine work setting; Set realistic goals or make plans independent of others; Interact appropriately with the general public; Maintain socially appropriate behavior." (Tr. at 299-301, 593-95.)

Dr. Goudy checked that Claimant has "Seriously limited, but not precluded" ability to: "Maintain attention for two hour segment; Maintain regular attendance and be punctual within customary, usually strict tolerances; Sustain an ordinary routine without special supervision; Work in coordination with or proximity to others without being unduly distracted; Complete a normal workday and workweek without interruptions from psychologically based symptoms; Deal with normal work stress; Understand and remember detailed instructions."  <u>Id</u>.

He indicated that Claimant "Unable to meet competitive standards" regarding: "Carry out detailed instructions; Deal with stress of semiskilled and skilled work."  <u>Id</u>.

Dr. Goudy further indicated that Claimant did have a low IQ or reduced intellectual functioning.  (Tr. at 301, 595.)  He found

33

that Claimant had "Mild - Moderate" "Restriction of activities of daily living" and "Difficulties in maintaining social functioning"; "Marked" "Deficiencies of concentration, persistence or pace"; and "Four or More" "Repeated episodes of decompensation within 12 month period, each of at least two weeks duration." (Tr. at 301-302, 595-96.)

Dr. Goudy concluded that on the average, he would anticipate that Claimant's impairments or treatment would cause her to be absent from work "more than four days per month." (Tr. at 302-303, 596-97.) He further checked statements that the impairment had lasted at least twelve months, that Claimant was not a malingerer, and that she could manage benefits in her own best interest. (Tr. at 303, 597.)

Records dated August 6, 2006 through August 9, 2006 indicate Claimant was hospitalized at Princeton Community Hospital. (Tr. at 305-53, 531-85.) Claimant was admitted through the emergency room "for suicidal ideation and suicidal attempt by cutting her wrist and alcohol intoxification." (Tr. at 316, 540.) Bizra Ghassan, M.D. states in a Discharge Summary:

> The patient was admitted to BMC for detox, stabilization and medication management. Vital signs during her stay were within normal limits...During her stay, the patient initially was complaining of mood swings, depression, feeling lost as she described. She reports good sleep, good appetite and fair energy. Later after starting Lexapro, the patient felt much better. Affect was brighter. She had more energy. Her appetite improved. She was ready to be discharged. The patient attended groups, interacted well with staff and patients. No

34

acting out or agitation...The patient was discharged
home. Continue Lamictal 225 mg nightly. Klonopin 0.5 mg
t.i.d. Lexapro 10 mg q.d. Follow-up with Southern
Highlands and follow-up with Dr. Patel.

PRINCIPAL DIAGNOSIS:
1. Bipolar disorder, not otherwise specified.

SECONDARY DIAGNOSIS:
1. Alcohol dependence.
2. Cannabis abuse.
3. History of polysubstance abuse.
4. Personality disorder, not otherwise specified.
5. Chronic neck and back pain.
6. History of rapid heart beat.
7. History of anemia.
8. Right hip pain.

(Tr. at 312-13, 540-41.)

On August 7, 2006, Claimant had a CT of the brain without IV

contrast. Afzal U. Ahmed, M.D. stated in a radiology report:

IMPRESSION:

Essentially normal CT of the brain without IV contrast.
No bleed, mass or midline shift. No previous exam
available for comparison.

(Tr. at 585.)

Records indicate Claimant had seventeen appointments at

Southern Highlands Community Mental Health Center from August 18,

2006 to August 20, 2008. (Tr. at 455-501, 691-713.) Although most

of the handwritten notations are illegible, what is clearly

written, shows Claimant to be receiving medication prescriptions

and management. Id.

On February 15, 2008, a State agency medical source completed

a Psychiatric Review Technique form. (Tr. at 502-15.) The

35

evaluator, Jeff Harlow, Ph. D., found that Claimant's impairment was not severe. (Tr. at 502.) Dr. Harlow stated the categories upon which the medical disposition is based are "12.04 Affective Disorders, 12.06 Anxiety-Related Disorders." Id. He concluded that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation during the period from January 25, 2007 to February 15, 2008. (Tr. at 512.) He found that the evidence did not establish the presence of the "C" criteria. (Tr. at 513.) Dr. Harlow concluded: "ANALYSIS - Clinical findings of the treating source denote mildly deficient KEY-Functional Capacities. Claimant comments about functional capacities are partially credible because they are externally inconsistent with these clinical results. Therefore, it is concluded that the Bipolar and Panic mental impairments are not severe." (Tr. at 514.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in assessing Claimant's mental impairments and residual functional capacity [RFC]; (2) the ALJ failed to properly consider Claimant's credibility; and (3) the ALJ failed to give great weight to the treating source opinions, particularly that of Dr. Vrinceanu. (Pl.'s Br. at 4-12.)

The Commissioner asserts that (1) the ALJ properly evaluated Claimant's mental impairments and accounted for them in the RFC; therefore, substantial evidence supports the ALJ's finding that Claimant retained the capacity to perform unskilled work; (2) the ALJ properly evaluated the credibility of Claimant's subjective complaints; and (3) the ALJ properly evaluated the treating source opinions, including Dr. Vrinceanu's.  (Def.'s Br. at 8-19.)

Residual Functional Capacity

Claimant first argues that the ALJ erred in assessing Claimant's mental impairments and RFC.  (Pl.'s Br. at 4-7.)  The Claimant asserts that the ALJ erred in concluding that while Claimant had the severe mental impairments of "bipolar disorder, anxiety disorder with self-reported panic attacks; and alcohol dependence, cannabis abuse, and drug abuse in self reported remission," she could return to her past relevant work or other unskilled work at all exertion levels. (Tr. at 21, 29, Pl.'s Br. at 6-7.)  Specifically, Claimant asserts:

> At the end of the first hearing as well as the second hearing, the ALJ did address a single hypothetical question to the vocational expert at the hearing and in response to that question the vocational expert opined that the hypothetical person could <u>not</u> perform her past work or any other work in the national economy.  <u>The ALJ asked no other questions</u>.  The hypothetical limitations were based upon the opinions from treating sources as to Ms. Justice's mental impairment.  The vocational expert did not state that Ms. Justice could perform her past work based upon any limitations set forth in any hypothetical.  Thus, there is no affirmative vocational testimony that Ms. Justice's past relevant work can be performed with the limitations set forth in the ALJ's

37

decision; those being that the tasks are simple and easy to learn and that Ms. Justice has limitations in concentration. Nowhere does the vocational expert state that those jobs can be performed with concentration deficits. Accordingly, the conclusion that Ms. Justice can perform her past relevant work with the limitations accepted by the ALJ is not supported by substantial evidence. In fact, it is not supported by any evidence.

The Commissioner's two decisions are significantly inconsistent as regards the mental impairment. In the first order, it is stated given her medical conditions that she could be expected to suffer moderate deficits in maintaining concentration, persistence or pace that limits her to simple, easy to learn unskilled work. Based upon that finding, it was concluded she could not perform any of her past relevant work. In the second decision, the one before this Court, without any change in the evidence before him, the ALJ concluded her limits on concentration were only mild to moderate, and that they would not prevent her performing her past relevant work. This change of opinion is not based upon any particular cited evidence or testimony, nor is it based upon vocational testimony. It is simply an unexplained change, not based upon substantial evidence of record. The jobs he concluded she could return to (cashier, stock clerk or waitress) in the current unfavorable decision were exactly the same jobs noted in the first decision that she could not return. Thus, this change of opinion is arbitrary and capricious and is not based upon substantial evidence.

It is well-settled law in the Fourth Circuit that where there are nonexertional limitations, that the Medical Vocational Rules (the GRIDS) cannot be used as conclusive, and that in such a case, the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform...Here, the record is clear that Ms. Justice suffers from significant nonexertional impairments...The vocational expert did not testify whether an individual with such limitations could perform any of those past jobs.

(Pl.'s Br. at 5-6.)

The Commissioner responds that the ALJ properly evaluated

38

Claimant's mental impairments and accounted for them in the RFC;
therefore, substantial evidence supports the ALJ's finding that
Claimant retained the capacity to perform unskilled work. (Def.'s
Br. at 9-11.) Specifically, the Commissioner asserts:

> In making his RFC determination, the ALJ thoroughly
> discussed the evidence supporting his assessment of
> Claimant's mental limitations. Specifically, the ALJ
> noted that although Plaintiff had a long history of
> treatment for a variety of psychological complaints,
> mental status examinations were generally within normal
> limits, and treatment notes from Drs. Syed and Vrinceanu
> indicated she made steady progress, improved with
> medication, and had, at most, mild-to-moderate
> limitations in concentration, persistence, and pace (Tr.
> 23-29, 39; 160, 251-52, 254-55, 258-59. 262. 266. 271,
> 273-74, 312, 387, 456, 461, 468-69, 472-73, 475-76, 479-
> 80, 495-96. 499-500, 696, 700). The ALJ also discussed
> that, during a consultative examination, Dr. Craft noted
> Plaintiff was "very cheerful, very well oriented, and
> related well to other people" (Tr. 23, 173), and that Ms.
> Tate observed that Plaintiff had only mildly deficient
> concentration (Tr. 24, 180). Additionally, the ALJ noted
> that Dr. Craft documented a normal mental status
> examination while Plaintiff was not taking any
> psychiatric medications due to her pregnancy (Tr. 388,
> 171-73). Furthermore, the ALJ noted that Plaintiff was
> able to raise her young child (Tr. 391).
>
> Other objective evidence supporting the ALJ's decision
> shows that Dr. Craft was unable to "detect any
> deterioration in [Plaintiff's] personal habits or any
> constriction of interests or any restriction of
> activities related to her nervous condition" (Tr. 171-
> 73). And, significantly, even Plaintiff's hired
> consultative examiner, Tony R. Goudy, Ph.D., did not
> opine that she was precluded from performing unskilled
> work (Tr. 299-301). Although Plaintiff was briefly
> hospitalized twice, in 2003 and 2006 - the latter more
> than two years prior to the ALJ's October 2008 decision -
> because of her mental impairments, the record as a whole
> reflects that she was not precluded from performing
> unskilled work.
>
> Despite Plaintiff's diagnoses of multiple mental

conditions, the relevant inquiry is always what
functional limitations, if any arise from her
limitations...The ALJ accounted for Plaintiff's
complaints about her slightly impaired concentration by
restricting her to simple, easy-to-learn unskilled work
(Tr. 22). Further limitations, as discussed above, were
not supported by the evidence of record, and the ALJ was
not required to incorporate them into the RFC...Plaintiff
has failed to support any further limitations from her
mental impairments with objective evidence of record.
Accordingly, the ALJ fully accounted for Plaintiff's
mental limitations in the RFC...

(Def.'s Br. at 9-11.)

The Commissioner further asserts that the vocational expert

("VE") testified that Claimant's past relevant work was unskilled

and, therefore, not in excess of Claimant's RFC, and that

Claimant's discussion of the hypothetical question and the Grids is

irrelevant:

Where the claimant's past work did not require the
claimant to perform activities in excess of the
claimant's residual functional capacity, the claimant
will be found not disabled. See 20 C.F.R. §§
404.1520(a)(4)(iv), .1560(b); 416.920(a)(4)(iv),.960(b).
Because the ALJ determined that Plaintiff retained the
RFC to perform unskilled work, he properly concluded at
step four that Plaintiff could perform her unskilled past
relevant work as a cashier, stock clerk, and waitress
(Tr. 29). It is Plaintiff's burden to demonstrate that
she cannot perform her past relevant work...Plaintiff has
failed to meet that burden here, and substantial evidence
supports the ALJ's decision....

Plaintiff's argument that the ALJ committed reversible
error with respect to the hypothetical question is
without merit, because the ALJ decided this case at step
four, finding that Plaintiff could perform some of her
past relevant work, and therefore the ALJ was not
required to conduct findings at step five. See 20 C.F.R.
§§ 404.1520(a)(4); 416.920(a)(4)...

Similarly, Plaintiff's argument that the ALJ misapplied

> the Grids (Pl.'s Br. at 6-7) is without merit because the
> ALJ did not decide this case using the Grids at step
> five; rather, he found that Plaintiff could perform her
> past relevant work at step four.  <u>See</u> 20 C.F.R. §§
> 404.1520(a)(4);  416.920(a)(4)...Accordingly,  this
> argument is wholly without merit.

(Def.'s Br. at 17-18.)

At steps four and five of the sequential analysis, the ALJ
must determine the claimant's residual functional capacity (RFC)
for substantial gainful activity.  "RFC represents the most that an
individual can do despite his or her limitations or restrictions."
<u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).
Looking at all the relevant evidence, the ALJ must consider the
claimant's ability to meet the physical, mental, sensory and other
demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a)
(2006).  "This assessment of your remaining capacity for work is
not a decision on whether you are disabled, but is used as the
basis for determining the particular types of work you may be able
to do despite your impairment(s)."  <u>Id.</u>  "In determining the
claimant's residual functional capacity, the ALJ has a duty to
establish, by competent medical evidence, the physical and mental
activity that the claimant can perform in a work setting, after
giving appropriate consideration to all of her impairments."
<u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the
Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)
(2006).

> In determining what a claimant can do despite
> his limitations, the SSA must consider the
> entire record, including all relevant medical
> and nonmedical evidence, such as a claimant's
> own statement of what he or she is able to
> unable to do.  That is, the SSA need not
> accept only physicians' opinions.  In fact, if
> conflicting medical evidence is present, the
> SSA has the responsibility of resolving the
> conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ wrote a very thorough 13-page decision, which included a full analysis of Claimant's impairments and the medical evidence of record.  (Tr. at 18-30.)  Regarding Claimant's mental impairments and residual functional capacity (RFC), the ALJ made these findings:

> After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual
> functional capacity to engage in work at all exertional
> levels, limited by an inability to perform more than
> simple, easy-to-learn unskilled work due to deficiencies
> in concentration and substance abuse.

> In making this finding, the undersigned has considered
> all symptoms and the extent to which these symptoms can
> reasonable be accepted as consistent with the objective
> medical evidence and other evidence, based on the
> requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-
> 4p and 96-7p.  The undersigned has also considered
> opinion evidence in accordance with the requirements of
> 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p
> and 06-3p...

> The medical evidence of record at the time of the initial
> decision reveals that claimant has a long history of
> treatment for a variety of medical complaints including
> bipolar disorder, anxiety disorder, and polysubstance
> abuse.  When referred by Dr. S. Syed for psychological
> testing in September, 2003, to provide information for

outpatient treatment planning, claimant underwent mental status examination and was administered a number of psychodiagnostic tests including an intelligence test and the Beck's depression and anxiety inventories. Mental status examination was generally within normal limits with only mildly impaired concentration despite complaints of a stressful life situation and endorsement of symptoms including hearing voices and occasional suicidal ideation. Claimant was offered, but refused, hospitalization. Obtained test results were considered a slight underestimate of claimant's general intellectual functioning due to mildly impaired concentration; however, it was noted that scores indicated average intellectual functioning and no suggestion of a learning disability. Although the depression and anxiety inventories were in the severe range, symptoms were self-reported and claimant refused hospitalization (Exhibit 1F). It was also noted that claimant had received inpatient hospitalizations in the late 1990s for suicidal ideation and a substance abuse problem. Earlier treatment with Dr. Syed indicated that claimant was not married, but had stopped taking drugs during an earlier pregnancy in which she had lost the baby. She related a history of childhood sexual abuse by an uncle. On September 26, 2003, when examined by Dr. Syed, claimant noted that she used to cut herself and had hallucinations, but no longer cut herself and denied any current suicidal ideation or hallucinations. He assessed intact memory, insight, and judgment and assigned a GAF ("Global Assessment of Functioning") score of 55 (Exhibit 1F/5)...

Notes from Appalachian Regional Healthcare indicate that claimant was hospitalized from November 7-16, 2003, for major depression, generalized anxiety disorder, and polysubstance dependence and treated by Safiullah Syed, M.D. Claimant had self-inflicted a laceration on her wrist, and was given Remeron with continuation of Seroquel. Urine drug screen was positive for benzodiazepines, cocaine, and cannabis. Upon discharge, she denied being suicidal or homicidal, and was characterized as stable and improved (Exhibit 2F). Note dated December 22, 2003, from Dr. Syed indicated that claimant was considered currently disable as of that date from November 10, 2033, to an undetermined date (Exhibit 3F).

Claimant was seen for consultative disability evaluation

with Gary Craft, M.D., on March 29, 2004.  It was noted that claimant was not on any medications for mental problems at that time and was fifteen-weeks pregnant. Mental status examination was completely normal (Exhibit 4F).

Consultative psychological evaluation was performed by Lisa C. Tate, M.A., on May 5, 2004...Claimant stated that she experienced cravings and social anxiety when she did not drink, and noted that she had been in detox at Appalachian Regional Hospital for alcohol treatment.  She denied using any drugs for at least one year, ignoring the fact that she had been hospitalized only six months earlier with a drug screen positive for a number of drugs....Mental status examination revealed normal memory and only mildly deficient concentration.  Diagnostic impression included mood disorder, anxiety, personality disorder, and polysubstance dependence in early remission (Exhibit 5F)...

On October 14, 2004, Alina Vrinceanu, M.D., psychiatrist, wrote a note that claimant had been under her care at Southern Highlands Community Mental Health Center since May 7, 2004, for diagnoses of bipolar disorder, NOS [not otherwise specified], and panic disorder with agoraphobia...Claimant described a work history as a cocktail waitress, becoming an exotic dancer when she discovered the amount of money that could be made dancing.  She noted that she had become "incredibly involved in drugs."... Claimant denied any use of cigarettes or IV drugs, but acknowledged heavy use for five or six years of marijuana, Ecstacy, GHB, and methamphetamines.  She sated that she had been clean for two years, despite occasional use of methamphetamines and involvement with old friends who convinced her to use. Claimant went on to describe how she had entered and won an "amateur" competition (stripping/exotic dancing) at Southern Exposure in Princeton, WV, and partied with her friends for two days (Exhibit 12F/28-31)....

At the request of counsel, claimant was seen by Tony R. Goudy, Ph.D., for psychological evaluation on August 3 and 21, 2006...The examiner concluded that claimant met the criteria set forth in Sections 12.04 and 12.06 of the Listing of Impairments, stating that despite only mild to moderate impairment in activities of daily living and social functioning, claimant showed marked impairment in concentration and repeated episodes of decompensation.

44

He completed a questionnaire indicating marked impairments in these areas and the likelihood of claimant's missing more than four days of work per month due to mental impairment (Exhibit 15F).

Discharge summary from Princeton Community Hospital indicates that claimant was admitted from August 6, 2006, through August 9, 2006, for diagnoses of bipolar disorder, alcohol dependence, cannabis abuse, polysubstance abuse, personality disorder, and chronic neck, back, and hip pain.  Discharge summary states that claimant was admitted for detox, stabilization, and medication management.  It was further noted that urine drug screen was positive for marijuana and alcohol (Exhibit 16F).

At the hearing on September 3, 2008, the claimant maintained that her depression has actually worsened since the previous hearing and has necessitated use of Lithium in addition to the medication she was previously taking.

The medical evidence of record for the period after the prior hearing reveals that the claimant continues to receive outpatient treatment at Southern Highlands Community Mental Health Center (Exhibit 18F).  In a "Mental Impairment Questionnaire" completed on June 16, 2006, Dr. Vrinceanu opined that limitations imposed by bipolar disorder and panic disorder with agoraphobia cause claimant to be unable to meet competitive standards relating to ability to sustain an ordinary routine without special supervision...

Subsequent to the hearing, counsel submitted 23 pages of medical evidence from Southern Highlands Community Mental Health Center covering the period from January 31, 2008 through August 20, 2008.  Those records establish that, at pharmacological management session on January 31, 2008, claimant was cooperative and interacted with the examiner.  Mood was depressed and affect was constricted, but memory was good and thought processes were logical and goal-oriented (Exhibit 35F/20).  Clinical findings were identical at subsequent visits on March 11, 2008, April 22, 2008, June 23, 2008, and August 20, 2008, and claimant was noted to have "improved with medication" (Exhibit 35F).

The undersigned notes that, in remanding the matter for

further action, the Appeals Council cited only the audibility of the hearing tape and an issue related to claimant's past relevant work. In the absence of any indication to the contrary, the undersigned must conclude that the Appeals Council took no exception to the residual functional capacity upon which the unfavorable decision was based. Thus, the portion of the decision that addresses claimant's residual functional capacity is recounted below.

In the previous decision, the undersigned noted that Section 105 of Public Law 104-121, enacted on March 29, 1996, provides that individuals for whom drug addiction and/or alcoholism is a contributing factor material to the determination that they are disabled are not eligible for or entitled to disability benefits. "Material" is defined as follows: the individual would not be found disabled if he or she stopped using drugs and/or alcohol. In the present case, alcoholism and drug abuse are an issue, but claimant has testified that any such abuse is in remission, and has been in remission for several years. Yet, the materiality of her polysubstance abuse is never reached in this decision, as the claimant is not found to be disabled, even when considering such abuse...

Turning to the issue of psychological impairment, there is simply no reliable medical evidence to substantiate that claimant's level of impairment is as debilitating as has been alleged. The undersigned has fully considered the conclusions of Dr. Syed, claimant's treating physician, that Claimant is incapable of any gainful employment due to mental impairments (Exhibits 12F and 14F). It is first of all noted that the letters in which such disability were reported are conclusory and offer very little in the way of clinical signs or findings, direct observation, or analysis of symptomatology and underlying pathology. The undersigned therefore accords very little weight to conclusions of disability contained therein inasmuch as they appear to be primarily based on claimant's self-reported symptoms which, as explained above, are in themselves suspect. It is further noted that such an opinion is inconsistent with Dr. Syed's own findings as embodied in progress notes (good memory, concentration, etc.) (Exhibits 13F/1, 4-5 and 14F/1). In addition, the opinion does not reflect ongoing polysubstance abuse and is inconsistent with the GAF scores of 55-60 which she gave claimant in progress notes...Dr. Goudy's opinion has also been thoroughly

46

considered.  It is noted that this opinion was the result
of a single evaluation and not an ongoing treatment
relationship, and had been procured by counsel for the
purpose of assisting the claimant in her disability claim
(Exhibit 15F).    The undersigned concludes that this
evaluation and the opinions of disabling impairment
arising therefrom were based on false or misleading
information supplied by claimant, who indicated to Dr.
Goudy that she had no history of alcohol or substance
abuse, denying any such, despite clear evidence to the
contrary in the form of a recent hospitalization for
detox.  The undersigned must conclude that the opinions
that claimant is precluded from working are entitled to
little, if any, weight since they are not supported by
medical signs and laboratory findings or adequate
explanations and are inconsistent with the record as a
whole.

(Tr. at 22-27.)

The ALJ analyzed the entire record, including the vocational

expert's opinions during the administrative hearings, and

determined:

The claimant is capable of performing past relevant work
as a cashier, stock clerk, or waitress.  This work does
not require the performance of work-related activities
precluded by the claimant's residual functional capacity
(20 CFR 404.1565 and 416.965).

At the hearing on September 3, 2008, the vocational
expert (Mr. Newman was also the vocational expert at the
first hearing and it was his testimony that was
inaudible) testified that claimant's past relevant work
as a cashier is an unskilled job performed at the light
level of exertion, her past relevant work as a
telemarketer is a semi-skilled job performed at the
sedentary level of exertion, her past relevant work as a
stock clerk is an unskilled job performed at the medium
level of exertion, her past relevant work as a waitress
is an unskilled job performed at the light level of
exertion, and her past relevant work as an exotic dancer
is a semi-skilled job performed at the medium level of
exertion.  Mr. Newman noted that the *Dictionary of
Occupational Titles* ("DOT") did not specifically list an
exotic dancer or stripper and that the DOT classification

47

of "dancer" is listed as a skilled job performed at the heavy level of exertion. Mr. Newman explained that he believed the DOT was classifying a "Broadway" or ballet type of dancer who might be required to lift a fellow dancer. In his professional opinion, an exotic dancer as described by the claimant was semi skilled and medium to the extent that the dancer might have to climb a pole or lift props. Except as noted, Mr. Newman's classification of claimant's past relevant work is generally consistent with the DOT. At the supplemental hearing, Mr. Newman obtained additional information from the claimant about her past relevant work and thus, he revised some of his prior testimony as to how he classified such work.

Accordingly, claimant's limitations do not prevent her from performing past relevant work as a cashier, stock clerk or waitress. As discussed in the prior decision, a similar conclusion would be reached at the fifth step of the sequential evaluation process based on a finding that there are a significant number of jobs in the national economy that claimant can perform (there are no exertional limitations and the unskilled job base is not eroded as claimant's only limitations is (sic) for unskilled work (Medical-Vocational Rule 204.00)).

(Tr. at 29.)

Claimant contends that although the ALJ properly posed hypothetical questions to the vocational expert at the August 31, 2006 and September 3, 2008 administrative hearings, "[t]he vocational expert did not state that Ms. Justice could perform her past work based upon any limitations set forth in any hypothetical," yet the ALJ found Claimant retained the capacity to perform unskilled work. (Pl.'s Br. at 5.)

Although Claimant did not take issue with the sound quality of the second hearing, the undersigned finds that both hearings had portions of the testimony stated as "inaudible" to the court reporter, and therefore, not accessible to readers of the

48

transcripts. (Tr. at 718-54, 755-72.) However, the court finds that the portions of the transcript that are audible and transcribed show extensive questioning by the ALJ and responses by the VE. (Tr. at 760-69.) Claimant's representative declined to question the VE. (Tr. at 769.) Additionally, the ALJ Decision clearly reflects the ALJ's attention to the VE's testimony. (Tr. at 29.) It is noted that while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

The court finds that the ALJ properly denied the claim at step 4. The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). In the instant case, the ALJ determined at the fourth inquiry that Claimant's impairments do not prevent the performance of past relevant work, therefore, further inquiry to step five was not necessary. Id. §§ 404.1520(e), 416.920(e). See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Therefore, Claimant's argument that the ALJ misapplied the Grids is also without merit because the ALJ did not decide this case using the Grids at step 5; rather, he found that Plaintiff could perform

49

her past relevant work at step 4.  See 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Claimant further contends that the ALJ's "two decisions are significantly inconsistent as regards the mental impairment...In the second decision, the one before this Court, without any change in the evidence before him, the ALJ concluded her limits on concentration were only mild to moderate." (Pl.'s Br. at 6.)  The undersigned finds this contention incorrect.  The Decision of October 9, 2008 clearly shows that the ALJ considered medical evidence of record obtained after the August 31, 2006 hearing, as well as Claimant's subsequent hearing testimony. (Tr. at 26, 690-713, 758-60.)  This new evidence reflected in part that clinical findings showed Claimant was noted to have "improved with medication."  Id.

The court notes that the hearing decision of January 25, 2007 does conclude that Claimant's past work as an exotic dancer and waitress were both classified as semi-skilled.  (Tr. at 394.) However, it is further noted that the ALJ explained at the onset of the September 3, 2008 hearing that the VE's previous testimony that Claimant's past work was unskilled was erroneously translated into his opinion as semi-skilled. (Tr. at 757.)  Because the ALJ found in both instances that Claimant was limited to performing unskilled work, he erroneously found in the original decision Claimant could not perform her past relevant work.  This clerical issue was

50

corrected at the second hearing and in the October 9, 2008 decision. (Tr. at 18, 761.)

The court finds Claimant's argument that the ALJ wrongfully evaluated Claimant's mental impairments and incorrectly accounted for them in the RFC to be without merit. The ALJ properly noted that despite Claimant's long history of treatment, her mental status examinations were generally within normal limits, including an examination by Dr. Craft performed while Claimant was not taking any psychiatric medications due to her pregnancy. (Tr. at 23-24, 171-74.) Further, the ALJ took into account Claimant's impaired concentration by limiting her to "simple, easy-to-learn unskilled work due to deficiencies in concentration and substance abuse." (Tr. at 22.)

Credibility Determination

Claimant next argues that the ALJ erred when he failed to properly consider Claimant's credibility. (Pl.'s Br. at 7-11.) Specifically, Claimant asserts:

> The ALJ rejects the credibility of the claimant primarily for two reasons - that she has not been honest about her drug use and that she had participated in a dancing competition (stripping) and partied with two friends, thus questioning how she overcame her agoraphobia and panic attacks so easily. In making this determination, the ALJ has been less than intellectually honest, and has simply ignored the facts...In the entire record, there is only one instance of a time when Ms. Justice clearly denied any drug use, and that was in an evaluative context...This one failure to be honest does not impact documented records in treatment settings going back to 2001 revealing serious mental health issues...In essence, the ALJ has ignored multiple hospitalizations, multiple

51

medical opinions from treating sources and sworn
testimony and concluded that her mental impairment is
mild, with little impact on her functioning.  That is
simply, clearly and unequivocally wrong.  It is not based
upon any fair or reasonable review of this record, and is
not supported by substantial evidence.

Likewise, as to her episode of participating in a dancing
competition and partying for two days, the ALJ concludes
that calls into question her credibility because she
couldn't possibly be as sick as she said if she did such
a thing.  The problem with the ALJ's reasoning is that
the dancing competition and partying episode <u>occurred</u>
<u>before her period of disability and before all the</u>
<u>medical opinions were expressed by the treating and</u>
<u>examining sources</u>...

The ALJ also uses her last hospitalization in 2006 to
support his conclusion that it is her substance abuse
problem, not a mental disorder, that is her problem.
Again, he is wrong.  To be certain, Ms. Justice did drink
some, and smoked some marijuana before the
hospitalization.  Yet, it was the cutting of her wrists
that led to the hospitalization.  The record speaks for
itself...

What all these facts reveal is that the ALJ's analysis of
her credibility based upon what he described as
inconsistencies are nothing of the sort, and the ALJ is
simply guilty of making a determination that she was not
entitled to benefits, and then crafting a decision to
support that decision.  His rationale regarding these
inconsistencies is flawed, lacks substance and is not
supported by substantial evidence...

In assessing credibility, SSR 96-7p also requires
consideration of seven factors in assessing the
credibility of an individual's statements.  The ALJ makes
no note of this requirement, and he does not comply with
it.

(Pl.'s Br. at 7-10.)

The Commissioner responds that the ALJ properly evaluated the

credibility of Claimant's subjective complaints.  (Def.'s Br. at

11-13.)  Specifically, the Commissioner asserts:

There is no merit to Plaintiff's argument that the ALJ failed to properly consider the credibility of her subjective complaints, or that the ALJ's credibility evaluation was limited solely to Plaintiff's inconsistent statements about her drug use and a two-day stretch of partying and participation in an amateur exotic dancing contest (Pl.'s Br. at 7-11).  The ALJ considered the credibility of Plaintiff's subjective complaints in accordance with the Commissioner's regulations and found that, although the record confirms that Plaintiff had bipolar disorder; anxiety disorder with self-reported panic attacks; and alcohol dependence, cannabis abuse, and drug abuse in self-reported remission; the record in its entirety did not fully support the frequency or symptom severity of these impairments claimed by Plaintiff (Tr. 23-29)...in fact, Plaintiff's treatment history reveals that her symptoms were not as consistently severe as she alleged.

Additionally, the evidence shows further that Plaintiff's statements about her symptom severity were not fully supported, because she reported that she could do housework and cook multiple meals on a daily basis, shop for food and household necessities on a weekly basis, was able to care for her young child, performed a variety of chores on a daily or weekly basis, had no problems with her personal care, and had no problems getting along with others (Tr. 84-86, 115-19, 137-38, 181)...Ultimately, the ALJ carefully considered all of the evidence before reasonably concluding that Plaintiff's allegations of disabling limitations were not totally credible.  Thus, substantial evidence supports the ALJ's credibility determination.

(Def.'s Br. at 11.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and

states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The ALJ wrote a very thorough evaluation of Claimant's impairments and the medical evidence of record, including Claimant's daily activities. (Tr. at 18-30.) The ALJ made these specific findings regarding Claimant's credibility:

> In the instant case, claimant's credibility is
> compromised by inconsistent statements set forth in the
> record. For example, it appears that clinical findings
> and diagnostic testing fail to fully support claimant's

54

allegations of symptoms and resulting functional limitations. This must be contrasted with hearing testimony that psychological and physical impairments drastically curtail all gainful activity.

The ALJ is to make credibility determinations, findings of fact, and resolve evidentiary conflicts, including inconsistencies in the medical evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, because the ALJ has the opportunity to directly observe a claimant, the ALJ's determination of a claimant's credibility is entitled to great weight. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). In the instant case, considering the record in its entirety, the undersigned concludes that claimant's assertions of complete inability to perform any sustained activity in an eight-hour day due to a combination of mental and physical impairments are simply not credible. It appears, rather, that many of claimant's symptoms have been exacerbated by a history of polysubstance abuse which, although she testified such abuse is in remission, caused her to be hospitalized as late of August 2006, as explained more fully above.

It is noted that Claimant worked as an exotic dancer for six years and, by her own admission, was heavily into drugs and alcohol during that time period. She returned to West Virginia and worked as a waitress/cashier at Cracker Barrel. Although she now states that she is agoraphobic and does not like to leave the confines of her home, it is noted that she got high on drugs and went with a group of friends in 2003 to Southern Exposure and won an amateur night stripping contest (although she was already a professional exotic dancer), an activity which undercuts assertions of inability to leave her own home. Other assertions that are inconsistent with the record as a whole include complaints of chronic severe neck pain since an automobile accident which occurred when claimant was nineteen years old juxtaposed against a history of work as an exotic dancer, work which obviously required a good deal of physical dexterity and would have been an unlikely choice for an individual who was experiencing the chronic pain alleged. It is noted that the State Agency Medical Consultants when reviewing the medical record found no evidence of any "severe" impairment, a medical opinion to which the undersigned has accorded determinative weight...

Dr. Goudy's opinion has also been thoroughly considered.
It is noted that this opinion was the result of a single
evaluation and not an ongoing treatment relationship...
The undersigned concludes that this evaluation and the
opinions of disabling impairment arising therefrom were
based on false or misleading information supplied by the
claimant, who indicated to Dr. Goudy that she had no
history of alcohol or substance abuse, denying any such,
despite clear evidence to the contrary in the form of a
recent hospitalization for detox...

Further inconsistencies also appear in the form of
claimant's comments to a variety of clinicians regarding
ongoing substance abuse and other issues.  For example,
she stated at an evaluation in 2004 that she did not use
drugs and had not used any drugs for one year, ignoring
the fact that hospital records revealed that she had been
seen in detox only six months earlier, in November 2003
(Exhibit 5F)....In short, claimant's credibility is
seriously compromised by a series of inconsistent
statements, and indications in the record that her mental
status is generally considered good despite periods of
decompensation which coincide with incidences of
substance abuse.  In fact, only three days after claimant
was first seen by Dr. Goudy in early August 2006, and
reported to him that she had no history of alcohol or
drug abuse, she voluntarily admitted herself to the
hospital for drug and alcohol abuse several days later
with urine drug screen positive for marijuana and alcohol
and a discharge diagnosis of polysubstance abuse.
Nonetheless, when seen by Dr. Goudy again on August 21,
2006, she told him only that she was admitted for
suicidal ideation and self-mutilation, failing to mention
that she had indulged in drugs and alcohol, and cut her
wrist after fighting with her husband (Exhibit 15F/2).
As claimant has repeatedly lied or been less than
truthful to various treating and examining sources, their
opinions as to her disability are suspect at best, since
such opinion are based in part in claimant's self-report
of symptoms and level of functioning.  Her truthfulness
to the undersigned at the remanded hearing is likewise
suspect when she claimed her mental condition
(depression) had gotten worse since the August 31, 2006
hearing, yet treatment notes show good response to
medications.  The undersigned also noted on the record
the claimant's tan at the supplemental hearing, which
suggested that she had been visiting a tanning salon or
was outdoors a lot.  She explained that she had been out

56

at her mother's pool.

(Tr. at 26-28.)

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause her alleged symptoms.  (Tr. at 21.)  The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medications, and treatment other than medication.  (Tr. at 22-29.) The ALJ explained his reasons for finding Claimant not entirely credible, including objective findings, Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform work at all exertional levels, limited by an inability to perform more than simple, easy-to-learn unskilled work, and her abundant self-reported daily activities. (Tr. at 26-29.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's credibility, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain and her credibility in keeping with applicable regulations, case law, and Social Security Ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. §404.1529(b)(2006; SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Evaluating Opinions of Treating Physicians

The Claimant next argues that the ALJ failed to give great weight to the treating source opinions, particularly that of Dr. Vrinceanu. (Pl.'s Br. at 11-13.) Specifically, Claimant asserts:

> First, he simply ignores the longitudinal record, its consistency in the reported symptoms and the nature of medical treatment over that time. Ms. Justice began treatment in 2001, seeing various psychiatrists and other medical professionals. Her complaints are the same, including the level of severity...A variety of treating psychiatrists have opined she is Bipolar, is depressed, anxious and suffers from panic disorder. Her most recent treating source, Dr. Vrinceanu, provided a specific medical source opinion regarding limitations that go directly to her ability to work. Based upon those limitations, the vocational expert testified there would be no work an individual with such limitations could perform. Dr. Vrinceanu treated Ms. Justice over a period of time, had a good treating relationship, noting consistent complaints, and is a psychiatrist. Thus, given the factors that are to be considered, her conclusion should be given significant weight. The ALJ gives it little weight...Clearly, the ALJ is simply ignoring the record and the treating source opinions.

(Pl.'s Br. at 12.)

The Commissioner responds that the ALJ properly evaluated Dr. Vrinceanu's and Dr. Syed's opinions. Specifically, the Commissioner asserts:

> The ALJ properly gave Dr. Vrinceanu's opinions little weight because they fail to provide objective support, rely upon Plaintiff's subjective complaints, and conflict with Dr. Vrinceanu's own treatment records and the other evidence of record, as discussed above (Tr. 25-26, 393; 248, 286-91)... First, Dr. Vrinceanu's opinions fail to provide objective signs to support the extreme limitations she asserts...
>
> Second, Dr. Vrinceanu's opinions are not based on objective findings, rather rely upon Plaintiff's

58

subjective statements.   That Dr. Vrinceanu recorded
Plaintiff's subjective complaints in her treatment
records does not convert them into an impairment
affecting her ability to work...

Third, Dr. Vrinceanu's opinions conflicted with her own
treatment notes and other objective medical evidence (Tr.
25, 26, 393). Her treatment notes fail to document any
significant deficits in memory, cognitive functioning,
orientation, or stream of thought (Tr. 393). Indeed, Dr.
Vrinceanu repeatedly noted Plaintiff's mental status
examinations were mostly normal and that Plaintiff
improved with medication, and she assessed GAF scores of
55 and 60, indicating at most only mild-to-moderate
symptoms (Tr. 25, 26, 251-52, 254-55, 258-59, 262, 266,
271, 273-74, 456, 461, 468-69, 472-73, 475-76, 479-80,
495-96, 499-500, 696, 700). These findings do not
support, and are inconsistent with, Dr. Vrinceanu's
opinions that Plaintiff was precluded from all work, and
the ALJ properly afforded them little weight....

The ALJ properly found Dr. Syed's conclusory opinion
similarly deficient (Tr. 23, 27, 392).   Dr. Syed's
December 2003 opinion that Plaintiff was temporarily
disabled from any gainful employment provided no medical
findings to support this conclusion and was inconsistent
with treatment notes showing mental status examinations
generally within normal limits with a GAF score of 55
(Tr. 23, 27, 388, 392; 161, 169, 170).

(Tr. at 13-16.)

The ALJ discussed at length the opinion evidence of Drs.

Vrinceanu and Syed, Claimant's treating physicians. (See Memorandum

Opinion at 41-45; Tr. at 23-29.)   The ALJ concluded: "As claimant

has repeatedly lied or been less than truthful to various treating

and examining sources, their opinions as to her disability are

suspect at best, since such opinion are based in part in claimant's

self-report of symptoms and level of functioning." (Tr. at 28.)

In evaluating the opinions of treating sources, the

59

Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.   See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).   Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2006).   The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2006).   Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).   As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.   Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2).

With respect to Claimant's argument that the ALJ gave insufficient weight to Dr. Vrinceanu's and Dr. Syed's opinions, the court finds that the ALJ properly considered the treating physician's opinion in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. In order for a treating physician's opinion to be given controlling weight it must be supported by clinical and laboratory diagnostic techniques and not be inconsistent with other substantial evidence. In the subject claim, Dr. Vrinceanu found Claimant's mental status examinations were mostly normal, that she improved with medication, and had GAF scores of 55 to 60, indicating at most only mild-to-moderate symptoms. (Tr. at 268-69.) Also, Dr. Syed's December 22, 2003 opinion that Plaintiff was temporarily disabled from any gainful employment provided no medical findings to support this conclusion and was inconsistent with treatment notes showing mental status

61

examinations generally within normal limits with a GAF score of 55. (Tr. at 169, 283.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED**, the plaintiff's motion for judgment on the pleadings is denied, and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: March 23, 2011

Mary E. Stanley
United States Magistrate Judge

62